946 F.2d 757
 57 Fair Empl.Prac.Cas. (BNA) 433,
57 Empl. Prac. Dec. P 41,084,
34 Fed. R. Evid. Serv. 390
James L. ADAMS, II, Plaintiff-Appellee,
v.
Thomas R. SEWELL, et al., Defendants,
Board of County Commissioners of Orange County, Florida,
Defendant-Appellant.
 No. 90-3645.
 United States Court of Appeals,
Eleventh Circuit.
 Nov. 4, 1991.
 
 G. Yates Rumbley, Orlando, Fla., for defendant-appellant.
 William D. Rowland, Winter Park, Fla., for plaintiff-appellee.
 Appeal from the United States District Court for the Middle District of Florida.
 Before KRAVITCH and BIRCH, Circuit Judges, and DYER, Senior Circuit Judge.
 BIRCH, Circuit Judge:
 
 
 1
 Appellee James Adams sued the Board of County Commissioners of Orange County, Florida (the "County"), and several individual County officials, under 42 U.S.C. § 1983 after his County employment was terminated following an investigation into charges that Adams sexually harassed a probationary employee in his department. Adams claimed, among other things, that the County's investigation violated his constitutional rights to substantive and procedural due process of law. At trial, the United States District Court for the Middle District of Florida directed a verdict on all claims in favor of the individual defendants. The jury ultimately awarded Adams $314,167 in damages on his due process claims against the County, and the County has appealed that award to this court. For the reasons that follow, we AFFIRM the jury verdict in this case.
 
 I. BACKGROUND
 
 2
 Adams was employed in the County's Environmental Protection Department (the "Department") from 1972 through January, 1987. Adams had risen to the position of Environmental Coordinator by August of 1986, when he hired Linda Mingarelli as a chemist in the Department. Adams was one of Mingarelli's supervisors once she began working in the Department.
 
 
 3
 In December, 1986, Adams complained about Mingarelli's job performance to John Bateman, the Department manager. Mingarelli was still considered a probationary employee at that time. Adams expressed concern that Mingarelli failed to follow established procedures for laboratory analysis and quality control before signing off on numerous reports that allegedly contained serious errors. Bateman's secretary overheard this conversation and told Mingarelli, who responded that Adams was angry because she had resisted his persistent social advances on several occasions. Bateman's secretary informed Bateman of Mingarelli's accusations, and Bateman met with both Adams and Mingarelli to discuss the situation on December 9, 1986. After several heated conversations, Bateman told both parties that he would postpone resolution of the matter until after the holidays to reduce the emotional intensity of the dispute. R5-312.
 
 
 4
 On December 18, 1986, Bateman told Adams that Thomas Sewell, the County Administrator, wanted them to attend a meeting at his office the next day. Bateman did not discuss the agenda for the meeting. When they arrived at Sewell's office, Adams was informed for the first time that two anonymous phone callers had accused him of sexually harassing Mingarelli. Id. at 311. An Assistant County Administrator, Jean Bennett, had already interviewed Mingarelli with respect to the charges. Adams was asked to respond orally to the accusations against him; he denied the harassment charge and discussed the errors he had found in Mingarelli's laboratory records. Adams was then asked if he had ever had a sexual relationship with a County employee, and he admitted to an extended relationship with a female chemist approximately six years earlier. R8-982.
 
 
 5
 At the close of the meeting, Sewell ordered that Adams be placed on paid personal leave until the County completed its inquiry into the matter. Adams was told not to speak with any member of the Department during the pendency of the investigation. Immediately after the meeting, Bateman and Robert Baker, the County Personnel Director, offered Adams an opportunity to resign without further investigation. Baker told Adams that employees who are accused of sexual harassment rarely win, but Adams refused to resign. R5-325-26.
 
 
 6
 The County disclosed the results of its investigation in a letter to Adams dated December 29, 1986. The letter stated that "your style of management was inconsistent with County policies and practices in several instances. Therefore, it is proposed that your employment with Orange County Government be terminated as soon as practicable." Plaintiff's Exhibit ("PX") 22. Adams was given until 3 p.m. on Monday, January 5, 1987, the first working day after the holidays, to rebut the unspecified charges against him or "offer an acceptable resignation." Id.
 
 
 7
 Adams's attorney responded to the County's letter on December 30, 1986. The response affirmed that Adams would not resign, and requested copies of certain records in the County's possession that were relevant to the dispute. The County did not provide the requested copies, but subsequently compiled sworn statements from several County employees who had been interviewed during its investigation. A copy of those statements was included in the County's written report on the investigation, which was mailed to Adams with a cover letter dated January 15, 1987. The cover letter informed Adams that his employment was terminated effective January 16, 1987; the County report alleged evidence of insubordination, improper management of and retaliation against subordinate employees, and abuse of authority. Defendants' Exhibit ("DX") 34.
 
 
 8
 On January 26, 1987, Adams initiated Step I of the County's three-step administrative grievance procedure by submitting a written complaint to his Department manager, and Bateman rejected Adams's claims on February 2. The second step of the process offered Adams a chance to present his grievance in a personal meeting with the division director, John McGarry. The Step II meeting was held on February 12, 1987, and Adams's attorney began informal settlement negotiations with the County Attorney, John Gehrig, after the meeting. The County grievance proceedings were postponed for several months while the parties attempted to settle the case, and McGarry never prepared a record of the Step II meeting. Finally, in June, 1987, Adams threatened to restart the grievance process unless his settlement demands were met. At that time, the County asserted that a settlement agreement was already in place and the matter was closed.
 
 
 9
 In September, 1987, Adams sought reinstatement to his former job by filing a petition for writ of mandamus in the Circuit Court in and for Orange County, Florida (the "state court"). The County asserted that Adams had agreed to a binding settlement, and the state court held a hearing on October 13, 1988, to decide whether the parties had settled the dispute. See PX 57. The County Attorney, John Gehrig, was the County's only witness at the hearing. The state court did not grant Adams's request for reinstatement, but found that the matter was not settled and that the parties had abandoned the County's grievance process by mutual consent during settlement negotiations. The court issued a writ of mandamus for another Step II meeting between Adams and the new division director, to be followed by a formal Step III hearing if Adams so requested.
 
 
 10
 After the state court hearing, Adams and his attorney were permitted to review Mingarelli's laboratory records and reports for the first time since the start of the grievance process. The review took place in Gehrig's office, but the county attorney refused to permit copying or removal of the records from his office. The second Step II meeting was held on November 4, 1988, and Adams's termination was upheld shortly thereafter. Adams then requested a Step III hearing before the County's Grievance Adjustment Board.
 
 
 11
 The Step III hearing was postponed twice, and Adams filed his complaint in federal district court on January 18, 1989, before the Step III hearing actually occurred. Adams alleges that the County insisted upon completion of the Step III hearing, although this case was pending at that time. The Step III hearing occurred on February 8, 1989, and the termination was affirmed by the County's Grievance Adjustment Board. Adams filed two appeals in the Florida state courts: the first sought review of the state court decision to deny his request for reinstatement, and the second appealed the results of the Step III hearing.[1]
 
 
 12
 The trial of this case in the district court began on April 11, 1990, and the jury returned a verdict for Adams against the County on April 20, 1990. Among other things, Adams contended at trial that the entire administrative process, including the Step III hearing, was a sham, and that the results of the County's investigation did not justify the decision to terminate his employment. The jury found that the County violated Adams's right to procedural due process of law in connection with his termination, and also that the County's decision to terminate was arbitrary, capricious, and pretextual in light of the stated reasons for the decision. The County has appealed the jury verdict to this court.
 
 II. DISCUSSION
 
 13
 A. Preclusive Effect of the State Court Action
 
 
 14
 The County first contends that this action is barred by res judicata, because Adams allegedly was afforded a full and fair opportunity to litigate his federal claims in the state court when he filed his petition for writ of mandamus. The Supreme Court has held that "issues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal § 1983 suit as they enjoy in the courts of the State where the judgment was rendered." Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 83, 104 S.Ct. 892, 897, 79 L.Ed.2d 56 (1984). In Migra, the preclusive effect was explicitly extended to bar federal claims that "a § 1983 litigant could have raised but did not raise in the earlier state-court proceeding." Id. at 83-84, 104 S.Ct. at 897-98; see also Lake Lucerne Civic Ass'n v. Dolphin Stadium Corp., 878 F.2d 1360, 1366 (11th Cir.1989), cert. denied, 493 U.S. 1079, 110 S.Ct. 1132, 107 L.Ed.2d 1038 (1990).
 
 
 15
 Under Florida law, a matter is not res judicata unless four conditions are satisfied: (1) identity of the thing sued for; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality in the person for or against whom the complaint is made. Lake Lucerne, 878 F.2d at 1366. Moreover, " '[t]he determining factor in deciding whether the cause of action is the same is whether the facts or evidence necessary to maintain the suit are the same in both actions.' " Id. (quoting Albrecht v. State, 444 So.2d 8, 12 (Fla.1984)). The district court's decision to reject the County's res judicata defense presents a question of law subject to plenary review on appeal. See McDonald v. Hillsborough County School Bd., 821 F.2d 1563, 1564 (11th Cir.1987).
 
 
 16
 In support of its res judicata argument, the County emphasizes that Adams sought back pay and reinstatement when he filed his petition for writ of mandamus in the state court. However, the state court focused on the issue of settlement and limited its hearing to the evidence on that issue. Adams convinced the court that he had never agreed to a settlement, but the state court refused to judge the propriety of Adams's termination or the adequacy of the pre- and post-termination hearings provided by the County. PX 57 at 68. The writ of mandamus merely ordered the parties to complete Steps II and III of the County's grievance process.[2] Under these circumstances, res judicata does not apply because Adams did not receive a legitimate opportunity to litigate his section 1983 claims in state court. See Migra, 465 U.S. at 84, 104 S.Ct. at 898.
 
 
 17
 The County also argues that the doctrine of abstention should have precluded the district court's consideration of this case. The abstention doctrine " 'is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.' " Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976) (quoting County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1063, 3 L.Ed.2d 1163 (1959)). Traditional principles of abstention permit a district court to decline or postpone the exercise of its jurisdiction in deference to a pending state court proceeding under specific circumstances; we note in passing that this case presents no such circumstances. See Colorado River, 424 U.S. at 813-817, 96 S.Ct. at 1244-46.
 
 
 18
 In Colorado River, the Supreme Court also recognized that dismissal of a federal action might be warranted in deference to a concurrent proceeding in state or federal court, even if traditional abstention principles were inapplicable. Id. at 817-19, 96 S.Ct. at 1246-47. However, such dismissals are strongly disfavored, unless "the clearest of justifications" is present to warrant dismissal. Id. at 819, 96 S.Ct. at 1247. Moreover, " 'the pendency of an action in the state court [generally] is no bar to proceedings concerning the same matter in the Federal court having jurisdiction.' " Id. at 817, 96 S.Ct. at 1246 (quoting McClellan v. Carland, 217 U.S. 268, 282, 30 S.Ct. 501, 505, 54 L.Ed. 762 (1910)). Adams filed his federal complaint before the Step III hearing was held; his state court appeal from that hearing was pending when this case went to trial. The County has offered no compelling justification for the extraordinary remedy of dismissal based upon Adams's pending appeal in state court.
 
 
 19
 B. The Denial of the County's Motion in Limine
 
 
 20
 The County next alleges that the district court erred by permitting Adams to introduce evidence at trial about the Step III hearing, which did not occur until after Adams filed his complaint in this case. Adams never amended his complaint or any other pleading to raise a specific claim that the Step III hearing was inadequate. The County filed a motion in limine to prevent Adams from discussing the Step III hearing at trial, but the motion was denied by the district court. We review that decision for an abuse of discretion. See United States v. Reyes-Vasquez, 905 F.2d 1497, 1499 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2869, 115 L.Ed.2d 1035 (1991).
 
 
 21
 Adams contends that the County violated his right to due process of law, and he offered evidence to support that claim at trial. For example, although he received a pre-termination "hearing" in the office of the County Administrator, Adams alleged that he was completely unprepared to defend himself because the County never told him what the meeting was about until after he arrived at Sewell's office. The County's first written notification to Adams of the charges against him was dated December 29, 1986, and included only a general allegation that his "style of management" was somehow improper, yet Adams was told to prepare a rebuttal or an "acceptable resignation" by mid-afternoon of the first working day after the New Year's holiday. PX 22. Moreover, the County never permitted Adams to borrow or copy the laboratory reports that formed the basis for his complaint against Mingarelli; those reports were zealously guarded by the County Attorney after the pre-termination "hearing" at Sewell's office.
 
 
 22
 At trial, Adams introduced evidence about the Step III hearing to fortify his claim that the County's administrative process was a sham from beginning to end. The evidence suggested that Adams did not receive a fair opportunity to present his case at the Step III hearing. However, as noted above, Adams offered significant evidence on his due process claims that was unrelated to the Step III hearing; according to Adams, the Step III hearing was just more of the same. None of Adams's claims were tied exclusively to the Step III hearing, so the district court did not abuse its discretion by denying the County's motion in limine and permitting the jury to hear testimony about the hearing.
 
 C. The "Relitigation" Claim
 
 23
 The County also argues that the district court trial was fundamentally flawed because the trial judge permitted Adams to "relitigate" the factual basis for his termination. According to the County, the district court only had to decide whether the County's administrative procedures satisfied due process requirements, and the court allegedly exceeded the bounds of its constitutional authority under Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). That case involved two high school students who were suspended from school. They alleged that the disciplinary action was taken in violation of their due process rights. The suspensions were reversed by the Eighth Circuit, but the Supreme Court vacated and remanded:
 
 
 24
 It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion. Public high school students do have substantive and procedural rights while at school. But § 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings or the proper construction of school regulations.
 
 
 25
 Id. at 326, 95 S.Ct. at 1003 (citations omitted). The County contends that the district court should have considered Adams's due process claims without examining the facts behind the County's decision to terminate his employment.
 
 
 26
 We disagree. Adams claimed that the County denied him procedural and substantive due process of law before and after he was fired. The substantive due process issue required the jury to decide whether the decision to terminate Adams's employment deprived him "of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and, because unrelated to the proper reasons for layoff, without any rational basis." Hearn v. City of Gainesville, 688 F.2d 1328, 1332 (11th Cir.1983).
 
 
 27
 The jury was minimally obligated to decide whether the County's proffered reasons for termination provided a rational basis for its action. That issue requires an examination of the County's version of the "facts" underlying its decision. Moreover, Adams was entitled to present his competing statement of "facts" because he claimed that the County's explanation was pretextual. The jury is obligated to resolve factual disputes and assess the credibility of witnesses. Boeing Co. v. Shipman, 411 F.2d 365, 375 (5th Cir.1969) (en banc).
 
 
 28
 Due process claims are fact-intensive, and Adams's legal arguments are inextricably intertwined with his factual allegations about the County's modus operandi in this case. Questions of law have little meaning outside the factual context of a particular case, and no reasonable jury could resolve these legal issues without considering the facts and evidence proffered by each party in support of their claims. Accordingly, we reject the County's appeal on this point.
 
 D. Sufficiency of the Evidence
 
 29
 The County contends that the evidence introduced at trial was insufficient to support the jury's verdict on Adam's procedural and substantive due process claims. A challenge to the sufficiency of the evidence presents a question of law subject to de novo review; we must determine whether the facts and inferences, considered in the light most favorable to Adams, point so overwhelmingly in favor of the County that reasonable jurors could not arrive at a contrary verdict. See T. Harris Young & Assocs. v. Marquette Elecs., Inc., 931 F.2d 816, 821 (11th Cir.1991).
 
 1. Procedural Due Process
 
 30
 Adams's federal constitutional claims are predicated upon his assertion of a property right in continued employment with the County. See Board of Regents v. Roth, 408 U.S. 564, 576-78, 92 S.Ct. 2701, 2708-09, 33 L.Ed.2d 548 (1972). If such a right existed, then the County could not deprive Adams of his property without due process of law. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985). The County's Personnel Policy Manual creates a property interest in continued employment for County employees, who may be discharged only for "violation of rules, unsatisfactory performance or conduct." DX 44, p 12.01; see also Loudermill, 470 U.S. at 538-39, 105 S.Ct. at 1491. We must now decide whether a reasonable jury could find that the pre- and post-termination hearings provided by the County violated Adam's property rights without due process of law.
 
 
 31
 The Due Process Clause requires that termination of a property right to continued employment must be preceded by notice and an opportunity for a hearing on the matter. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). The Supreme Court has held that pre-termination procedures need not be elaborate: "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." Loudermill, 470 U.S. at 546, 105 S.Ct. at 1495. In Loudermill, the Court noted that cursory pretermination proceedings may be acceptable if the employee is entitled to a full evidentiary hearing within a reasonable time after termination. Id. at 546-47, 105 S.Ct. at 1495-96.
 
 
 32
 Adams was first informed of Mingarelli's charges against him on December 9, 1986, when Bateman met with Adams and Mingarelli to discuss the situation. The meeting ended when Bateman agreed to table the matter until "the dust settle[d]" after the holidays. R5-312. The next meeting occurred on December 19, 1986, when Bateman and Adams were summoned to the office of the County Administrator, Thomas Sewell. Id. at 307-08. Neither Adams nor Bateman knew the purpose of the meeting or the topics to be discussed. Id. at 308-10; R8-980-81.
 
 
 33
 At that meeting, Sewell and his assistant, Jean Bennett, related Mingarelli's charges against Adams and told him for the first time that two anonymous phone callers had also accused him of sexually harassing Mingarelli. R5-311. Although Adams was unprepared to defend himself, he was given an opportunity to respond to the charges against him. R8-982. Adams explained that he had spoken to Bateman about Mingarelli's job performance because she failed to follow proper quality control procedures in the laboratory; Mingarelli first aired her complaints against Adams after she discovered that he had criticized her work. Sewell ordered Bateman to collect Mingarelli's lab records and lock them away, and Adams was placed on paid personal leave while the County investigated the charges against him. R7-827-28, 815-16.
 
 
 34
 When viewed in the light most favorable to Adams, the evidence suggests that Adams had no notice of or opportunity to prepare for his pre-termination "hearing" on December 19, 1986. The evidence also indicated that Adams was not afforded access to the lab records that formed the basis for his alibi until long after he was fired. R8-988-92. On December 29, 1986, Adams received written notice that his "style of management was inconsistent with County policies and practices in several instances," and he was told to respond to those vague allegations before 3 p.m. on January 5, 1987, the first working day after the New Year's holiday. PX 22. The County terminated Adams's employment on January 16, 1987.
 
 
 35
 A reasonable juror could conclude that the County's pre-termination procedures effectively denied Adams "an opportunity to present his side of the story." Loudermill, 470 U.S. at 546, 105 S.Ct. at 1495. However, abbreviated pre-termination proceedings may nonetheless satisfy due process requirements if Adams received a full and fair hearing within a reasonable time after termination. Id.; see also Kelly v. Smith, 764 F.2d 1412, 1415 (11th Cir.1985). Accordingly, we must now examine the adequacy of the post-termination grievance procedures afforded to Adams in this case.
 
 
 36
 The County contends that its three-step grievance process, which culminated in the Step III hearing, satisfied Adams's right to post-termination due process of law. The Step III hearing before the County's Grievance Adjustment Board (the "Board") allegedly provided Adams with an opportunity to present his case and cross-examine the witnesses against him in an impartial forum. This court has emphasized the importance of cross-examination in due process analysis; post-termination proceedings have been held inadequate because a terminated employee "had no opportunity to confront and cross-examine his accuser in the presence of the decision maker." Kelly, 764 F.2d at 1415.
 
 
 37
 Adams argues that the County's grievance process was a sham from beginning to end, and he presented evidence at trial to support that claim, including the transcript from the Step III hearing. See PX 54. For example, when the Step III hearing was scheduled, Adams was told that the hearing would be chaired by a Mr. Philip Brown, who had no prior involvement with this dispute. PX 52; R8-1018-19. However, when Adams and his attorney arrived at the hearing, they found that Mr. Brown had been replaced by Jean Bennett, the Assistant County Administrator who had interviewed Mingarelli and conducted the pre-termination investigation. R8-1019. Adams suggested at trial that Bennett could not be impartial because of her prior involvement with the investigation.
 
 
 38
 Moreover, at the Step III hearing and again at trial, Bennett claimed that the Board had no subpoena power to compel unwilling witnesses to testify. PX 54 at 217; R10-1514. Adams disagreed, citing Rule 10.10 of the County's Personnel Policy Manual, which compels County employees to appear before any "board or body authorized by law to conduct any hearing or inquiry ... to answer any questions relating to matters arising out of his/her employment" under penalty of termination for failure to appear. DX 44, p 10.10; R10-1512-14. The Board refused to compel the County's witnesses, specifically Mingarelli, to appear as witnesses for Adams. PX 54 at 213-14. Adams argued at trial that he was thereby precluded from effectively presenting his case because he had no power to question Mingarelli or anyone else beyond the limited scope of the County's direct examination.
 
 
 39
 The County began its presentation of evidence shortly after the hearing convened at 9:20 a.m. on February 8, 1989, and rested at approximately 7:00 that evening. Id. at 389. Adams was then told to begin his presentation because Bennett insisted that the hearing had to be completed in one day.[3] Id. at 394. Adams alleged that he was unable to present his witnesses at the Step III hearing because they had all left work by the time he was expected to begin his case. Id. at 389-90. When the Board denied his request for a continuance, Adams and his attorney objected to the perceived unfairness of the entire hearing and walked out without offering any evidence to rebut the County's case. Id. at 386-98. The Board denied Adams's grievance that same evening. Id. at 414.
 
 
 40
 Although the Step III proceeding included the procedural formalities of an evidentiary hearing, at trial Adams contested the adequacy and fairness of the hearing, as well as the impartiality of the presiding Board, and introduced evidence to support his allegations. These claimed deficiencies in the post-termination process are important because, as noted above, Adams alleged significant procedural flaws in the County's pre-termination process. Under these circumstances, the pre-termination problems were not "cured" by the post-termination hearing, and reasonable jurors could find that the pre- and post-termination procedures provided by the County were inadequate. Accordingly, we deny the County's appeal of the jury verdict for Adams on his procedural due process claim.
 
 2. Substantive Due Process
 
 41
 In addition to his procedural claim, Adams contended that the County terminated his employment "for an improper motive and by means that were pretextual, arbitrary and capricious, and, because unrelated to the proper reasons for layoff, without any rational basis." Hearn, 688 F.2d at 1332. Such allegations raise a claim for violation of substantive due process rights. Id.; see also Barnett v. Housing Authority of Atlanta, 707 F.2d 1571, 1577 (11th Cir.1983). "Unlike procedural due process claims, which challenge the adequacy of the procedures used by the government in deciding how to treat individuals, substantive due process claims allege that certain governmental conduct would remain unjustified even if it were accompanied by the most stringent of procedural safeguards." Gilmere v. City of Atlanta, 774 F.2d 1495, 1500 (11th Cir.1985) (en banc), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). In such cases, "the constitutional violation is complete at the moment when the harm occurs." Id.
 
 
 42
 In Barnett, the jury found a substantive due process violation where the plaintiff had a protected property interest in continued employment and he introduced substantial evidence indicating that the stated causes for his dismissal were pretextual. Barnett, 707 F.2d at 1577. On appeal, the employer contended that "by submitting the substantive due process question to the jury, the district court impermissibly invaded the agency's discretion to interpret its own regulations, which set forth the reasons for termination." Id. This court disagreed, holding that the substantive due process violation arose because the stated reasons for dismissal differed from the actual motive for the employer's action. Id. at 1577-78; see also Hearn, 688 F.2d at 1333-34.
 
 
 43
 In this case, Adams similarly offered evidence that the County's proffered reasons for his discharge were pretextual. He alleged that the County was afraid of the adverse publicity that would accompany a lawsuit if Mingarelli pursued her sexual harassment claim, and therefore concocted allegations that Adams used "improper management techniques" and collected supporting affidavits from disgruntled employees to support the charges. See DX 34.[4] Adams's personnel file included no mention of any problems involving his relationships with other employees and indicated that his job performance was consistently above average during his 14-year career with the County. DX 5. Adams also complained that the grievance proceedings produced no significant evidence to support the County's charges against him.
 
 
 44
 We conclude that the evidence was "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc). Adams produced enough evidence to present his substantive due process claim to the jury. Accordingly, the County's appeal on this issue is denied.
 
 E. The District Court's Jury Instructions
 
 45
 The County next contends that the district court committed reversible error when instructing the jury on the applicable law. Specifically, the County appeals the district court's decision to read two of Adams's proposed instructions to the jury, as well as the court's refusal to read two of the County's proposed instructions. In reviewing the first claim, we must determine whether the jury instructions as a whole properly express the applicable law. Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir.1991). If they do, then no reversible error has occurred "even if an isolated clause may be inaccurate, ambiguous, incomplete, or otherwise subject to criticism." Id. The failure to give a requested instruction is error "only if the requested instruction is correct, is not adequately covered by the charge given, and deals with a point so important that failure to give the instruction seriously impaired the defendant's ability to present an effective defense." United States v. Hill, 935 F.2d 196, 200 (11th Cir.1991).
 
 
 46
 The County objected to Plaintiff's Requested Jury Instruction Nos. 6 and 7 at the charge conference, but the district court overruled the objections and read the proposed instructions to the jury.[5] R11-1703-06, 1776-78. The County argued that Instruction No. 6 was misleading because the substantive due process issue is not whether Adams's employment was terminated for good cause, but rather whether the County had any rational basis to discharge him. Id. at 1703-05. The County also objected to Instruction No. 7 on similar grounds. Id. at 1705-06. These objections are meritless because the instructions, taken together, correctly state the applicable law. See Johnson v. Bryant, 671 F.2d 1276, 1280 (11th Cir.1982). Instruction No. 6 could be misleading or ambiguous if read alone, but Instruction No. 7 cures the problem by explaining that the County had "good cause" to terminate Adams's employment if it had reasonable grounds to believe that he committed the acts specified in the stated grounds for discharge. If not, then the stated grounds were pretextual and the County violated Adams's right to substantive due process of law. See Hearn, 688 F.2d at 1333-34.
 
 
 47
 The district court also refused to accept the County's Requested Jury Instruction Nos. 13 and 14. R3-70-15-16; R11-1711-12. Instruction No. 13 stated that the decision to terminate Adams's employment was actionable only if there was no rational connection whatsoever between the information supplied to Orange County and the decision to terminate. R3-70-15. The district court rejected the proposed instruction as potentially confusing to the jury, and its final instructions included an accurate statement of the law of substantive due process. R11-1711; R3-75-9. Instruction No. 14 simply restated Instruction No. 13 and added the County's relitigation argument; the district court properly rejected the proposed "instruction" as argumentative. R11-1712. Accordingly, we find no error in the district court's instructions to the jury in this case.
 
 F. Expert Testimony on the Issue of Damages
 
 48
 The County's final claim on appeal is that the district court erred by permitting Adams to offer expert testimony on the issue of damages without establishing any evidentiary basis for his expert's opinion. The County objected to the expert's testimony at trial, but the district court refused to exclude the evidence because any purported lack of foundation for the expert's opinion could be raised on cross-examination. R9-1201-03. The district court is afforded great discretion in ruling on the admissibility of expert testimony, and we will reverse only for a clear abuse of that discretion. Manufacturing Research Corp. v. Graybar Elec. Co., 679 F.2d 1355, 1366 n. 21 (11th Cir.1982).
 
 
 49
 In this case, the County cross-examined Adams's expert at length regarding the factual bases for his damage calculations. R9-1217-42. The district court also explained the standard of proof for recovery of damages in its jury instructions. R11-1783-86. The County's objections are properly directed to the weight and not the admissibility of the expert's testimony, and this claim is therefore denied. See Barnes v. General Motors Corp., 547 F.2d 275, 278 (5th Cir.1977).
 
 
 50
 AFFIRMED.
 
 
 
 [1]
 The Fifth District Court of Appeal of Florida affirmed the grant of mandamus relief and the denial of Adams's claim for reinstatement on March 20, 1990. The record on appeal before this court does not include any final disposition of Adams's state court appeal from the Step III hearing
 
 
 [2]
 The hearing transcript indicates that the state court questioned the propriety of the hearing on jurisdictional grounds. PX 57 at 63. The court attempted to limit both the scope of the hearing and the relief granted, and never reached the substance of Adams's due process claims
 
 
 [3]
 At the beginning of the hearing, Bennett stated that "we will have to conclude the proceedings today because the Chair has another commitment for tomorrow." PX 54 at 23. At trial, she explained her prior commitment by admitting that "I was scheduled to be off [from work] the next day." R10-1508
 
 
 [4]
 Interestingly, the County's letter of termination did not charge Adams with sexual harassment or otherwise offer any specific findings that would support such a charge. At the Step III hearing, the County's attorney stated that "sexual harassment was not a basis for this disciplinary action." PX 54 at 17
 
 
 [5]
 Plaintiff's Instruction No. 6 read as follows: "The first issue for your determination is whether Defendant's termination of Plaintiff's employment was improper. The Court instructs you that, as a matter of law, an employee under the Policy and Procedures of the Defendant may be terminated only for good cause. Unless you find that Defendant had good cause to terminate the employment of Plaintiff, then you should find that Defendant's termination was improper." R2-69-6
 Plaintiff's Instruction No. 7 read in pertinent part as follows: "Termination of employment for good cause means termination for reasonable grounds, in good faith, based on the employer's reasonable belief at the time of termination. An issue for your determination is whether Defendant had 'good cause' to terminate Plaintiff for, as stated by Defendant, (1) Improper management technique due to intimidation and harassment of subordinate employees, (2) Institution of retaliatory investigation into job performance of subordinate employees, or (3) Misuse of authority as a supervisor to the point that his conduct was unbecoming a supervisor and an employee of Orange County...." Id. at 7.